## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 316 UPPER CROSS ROAD, LEBANON, MAINE | No. 2:19-mj-190-JHR |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Shane Larkin, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I am a New Hampshire State Trooper with the New Hampshire State Police ("NHSP") having served in this capacity since August 2, 2002. I have been assigned to the NHSP Narcotics and Investigation Unit ("NIU") since April 2013. In April 2013, I was assigned to the Federal Bureau of Investigation Safe Streets Gang Task Force ("SSGTF"). During my career with the NHSP, I have conducted and participated in physical and electronic surveillance, written and executed search warrants which have resulted in the seizure of controlled substances and the arrests of narcotics distributors, debriefed informants and reviewed recorded conversations and narcotics records. I have investigated violent crimes and violent street gangs, narcotics trafficking, money laundering, and wiretap investigations while assigned to the FBI's Safe Streets Gang Task Force. Additionally, I have attended narcotics and criminal investigation training classes put on by the New Hampshire State Police, New Hampshire Police Standards and Training Council, and the Federal Bureau of Investigation.

2.  In the course of my law enforcement training and experience, I have had an

1

opportunity to search for, seize, and personally observe what I have recognized to be and what was later confirmed by drug analysis to be scheduled drugs, including but not limited to heroin, fentanyl, methamphetamine, cocaine, marijuana (both dried and growing), crack cocaine, and various narcotics lawfully available only by prescription. I have conducted or participated in among other things, surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of taped conversations relating to narcotics trafficking. I have assisted in many other investigations, both state and federal. I have drafted drug related search and arrest warrants and have assisted in the execution of numerous search and arrest warrants in which controlled substances, drug paraphernalia, drug related electronic data, and other contraband was found. Through my training and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

3. Based on my training and experience, I am aware that most drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities to communicate with their supplier(s) and customers. Cell phones are often the easiest way for drug buyers/traffickers to rapidly communicate the necessary logistical information back and forth, such as where to meet suppliers or customers, and how much a specific drug / quantity of drug will cost. Drug users/traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, however drug users/traffickers' wireless accounts routinely contain text messages that are easily explained as evidence of drugs crimes and show cash exchanging hands between suppliers, dealers, and customers.

4. The statements contained in this affidavit are based, in part, on information provided by the FBI and the participating agencies of the FBI's New Hampshire Safe Streets Gang Task Force. In preparing this affidavit, I have prepared reports and reviewed reports prepared by other investigators regarding witness interviews, surveillance and other investigative efforts regarding this investigation. In addition, I have discussed this investigation with other officers involved in the case. Through my own observations, my conversations with other officers and my analysis of reports prepared by other officers, I am familiar with this investigation.

## I.   LOCATION TO BE SEARCHED

5. I seek a search warrant to search the following location: 316 Upper Cross Road, Lebanon, Maine ("the Target Residence"). The Target Residence is the building on the right side of the photograph shown below:



The Target Residence is light brown, one story, single-wide mobile home shown on the right side of the above photograph. As shown in the above photograph, to enter the Target Residence, one proceeds down a driveway, walks up a short exterior set of wooden steps, and enters the Target Residence through a red door.

## II.   DESCRIPTION OF PROPERTY TO BE SEIZED

See Attachment B.

## III.   SHOWING OF PROBABLE CAUSE

### Background Information from Confidential Source

6.   The FBI is currently conducting an investigation into drug trafficking activities conducted by Angel Valle and his associates in the District of Maine. Information relevant to

4

this investigation has been provided to the FBI, by a Confidential Source ("CS") who has provided information to the FBI since March 2019. CS began cooperating with the FBI after the FBI approached CS. The CS has not received any financial gain or promises in regards to its current and past legal issues from the FBI as a result of its cooperation. It is likely that CS hopes for consideration in exchange for the CS's cooperation, in the form of leniency for past criminal conduct committed by the CS. The CS has a long and serious criminal history with multiple felony and misdemeanor convictions, for crimes such as Felonious Sexual Assault, False Report, Willful Concealment, Felony Assault, Misdemeanor Assault, Burglary, Resisting Arrest, Theft by Unauthorized Taking, Reckless Conduct.

7.  I have corroborated much of the information provided by CS through police reports of incidents that CS has described and other intelligence. The information provided by CS has proven to be credible throughout CS's cooperation. Additionally, CS's information has been corroborated by information obtained from various public databases. Moreover, CS has readily admitted to CS's own participation in criminal activity, including the possession and distribution of controlled substances. For these reasons, I consider CS reliable.

8.  The CS informed me that the CS has known Valle for a period of over 10 years and has known Valle to sell controlled substances during the period of time that the CS has known Valle. In addition, the CS informed me that the CS has previously purchased controlled substance including fentanyl/heroin and cocaine base from Valle on many prior occasions, many of which occurred within the last 4 years, and some of which occurred at or near the Subject Residence. The CS has a history of purchasing and distributing controlled substances such as

5

fentanyl/heroin and cocaine base, and is thus familiar with the appearance of and methods of processing and packaging such substances.

### First Controlled Purchase

9. On May 11, 2019, I met with the CS in preparation for a planned meeting between the CS and Valle. The CS was provided with audio and video recording and transmitting equipment, and directed to proceed to the Subject Residence. The CS left and returned to me several hours later. Upon the CS's return, the CS was debriefed, and provided the following information, in substance and in part: The CS went to the Subject Residence and Valle was not present when the CS arrived, but a female individual allowed the CS to enter the residence. Inside the Subject Residence, the CS observed the female individual cooking "crack," also known as cocaine base, on a stove in the Subject Residence. Valle eventually arrived in the Subject Residence and met with the CS, and ultimately brought the CS into a garage outbuilding. The CS and Valle engaged in a conversation wherein, in substance and in part, Valle agreed to sell the CS 20 fingers in exchange for $4,000, and indicated that another individual would deliver the fingers to the CS. Based on my training and experience, "fingers" are cylindrical packages containing approximately 10 grams of heroin and/or fentanyl. I have reviewed video and audio surveillance footage of the CS's meeting with Valle and Valle's associates described above. This video and audio surveillance footage is consistent with the CS's description of the events.

10. On or about and between May 13, 2019, and May 14, 2019, the CS and Valle engaged in communications, via cellular telephone, regarding the planned transaction. On May 13, 2019, I met with CS in advance of another planned meeting with Valle. The CS was provided with $4,000 in pre-recorded buy money, as well as audio and video recording and transmitting equipment, and directed to proceed to a meeting with Valle. The CS then made a telephone call to Valle, who directed the CS to meet him at a location in Lebanon, Maine. The CS then left my presence, and returned a short time later.

11. Upon the CS's return, the CS was debriefed regarding the meeting with Valle, and provided the following information, in substance and in part: The CS met with Valle and provided Valle with $4,000 pre-recorded buy money. Valle indicated to the CS, in substance and in part, that the drug transaction would occur the next day, and that another individual might bring the drugs to the CS. I have reviewed video and audio surveillance footage of the CS's meeting with Valle described above. This video and audio surveillance footage is consistent with the CS's description of the events.

12. On May 13, 2019, I met with the CS and search the CS and the vehicle used by the CS for contraband, weapons, and unexplained currency, with negative results. I provided the CS with audio and video recording equipment. The CS then left my presence, returned to me approximately one hour later, and provided me with a plastic bag containing approximately 20 cylindrical plastic packages containing a tan powder. The tan powder was tested using a Tru Narc device, which returned an inconclusive result. Based on my training and experience, fentanyl often tests as inconclusive using the Tru Narc Device. In addition, based on my training and experience, the appearance of and method of packaging of the tan powder is consistent with that of fentanyl.

13. Upon the CS's return, the CS was debriefed regarding the controlled purchase and provided me with the following information, in substance and in part: The CS engaged in telephone communication with Valle during which Valle directed the CS to go to a location in Lebanon, Maine. The CS arrived at the location, and met an individual who identified himself as Valle's brother "Jeff." "Jeff" handed the CS the plastic bag containing approximately cylindrical packages containing tan powder, which the CS then brought directly to me. I have reviewed video and audio surveillance footage of the CS's meeting with Valle's associate Jeff described above. This video and audio surveillance footage is consistent with the CS's description of the events.

## Second Controlled Purchase

14. On May 28, 2019, I met with the CS and at my direction, the CS spoke with Valle via cellular telephone, and arranged to purchase approximately 30 "fingers" from Valle. Valle agreed to meet the CS at a location in New Hampshire. Prior to the planned meeting, I searched the CS, and another FBI agent searched the CS's vehicle, for contraband, weapons, and unexplained currency with negative results. I provided the CS with video and audio recording and transmitting equipment and approximately $6,000 in pre-recorded buy money. The CS was then directed to proceed to the meeting with Valle.

15. FBI Agents observed that the CS travelled to the agreed upon meeting location and waited for Valle to arrive. A short time later, FBI agents observed that Valle arrived at the location driving a Black Chevrolet Malibu with one male passenger inside. FBI Agents observed the CS enter the vehicle. A short time later, FBI Agents observed the CS leaving the meeting location. The CS then returned directly to me.

16. The CS was debriefed following the above described meeting with Valle, and provided the following information, in substance and in part: After the CS entered Valle's vehicle, Valle instructed the CS to give the money to the male passenger, and indicated the male passenger would count it. The CS handed the money to the male passenger, and Valle indicated that the drugs would be provided to the CS later that evening. I have reviewed video and audio surveillance footage of the CS's meeting with Valle described above. This video and audio surveillance footage is consistent with the CS's description of the events.

17. On May 28, 2019, several hours after the CS's initial meeting with Valle, the CS made a recorded telephone call to Valle and arranged to meet Valle at the Subject Residence. Prior to the planned meeting, I searched the CS, and another FBI agent searched the CS's vehicle, for contraband, weapons, and unexplained currency with negative results. I provided the CS with video and audio recording and transmitting equipment. The CS was then directed to proceed to the Subject Residence at which point the CS left my presence. A short time later, the CS returned to me and provided me with a plastic bag containing approximately 30 cylindrical packages containing a powdery substance.

18. The CS was debriefed following the above described meeting with Valle, and provided the following information, in substance and in part: The CS entered the Subject Residence and observed the male passenger present at the earlier meeting with Valle in New Hampshire inside the Subject Residence. The CS entered the kitchen of the Subject Residence and met Valle. Valle then directed the CS to a plastic bag on the kitchen table that contained approximately 30 cylindrical packages of a powdery substance. While the CS was present, the CS observed Valle and the male passenger packaging suspected controlled substances while wearing plastic gloves. In addition, the CS observed a female individual cooking suspected crack

9

on the kitchen stove and packaging quantities of suspected crack cocaine. The CS left the Subject Residence, and returned directly to me with the bag containing the 30 cylindrical packages of powdery substance. The powdery substance was tested using a Tru Narc device, which returned an inconclusive result. Based on my training and experience, fentanyl often tests as inconclusive using the Tru Narc Device. In addition, based on my training and experience, the appearance of and method of packaging of the powdery substance is consistent with that of fentanyl. I have reviewed video and audio surveillance footage of the CS's meeting with Valle and Valle's associates described above. This video and audio surveillance footage is consistent with the CS's description of the events.

19. On June 16, 2019, at my direction, the CS went to the Subject Residence to meet with Valle. The CS was not equipped with audio or video recording equipment at that time. After the meeting, the CS informed me, in substance, and in part, that the CS met Valle inside the Subject Residence. The CS further informed me that the CS observed Valle cooking crack cocaine on the stove in the kitchen of the Subject Residence, and that the CS also observed approximately multiple "fingers" of heroin and/or fentanyl in the kitchen of the Subject Residence. While inside the Subject Residence, the CS and Valle spoke about the CS purchasing more heroin and/or fentanyl from Valle, and Valle told the CS to let Valle know when the CS was ready to make another purchase, and that Valle would be able to obtain the heroin and/or fentanyl for the CS.

## TRAINING AND EXPERIENCE OF AFFIANT

20. Based upon my training, experience, and the training and experience of other agents with whom I have worked and spoken, I know that:

10

a. drug traffickers often store drugs in private places including in their residences, their vehicles, and in stash houses;

b. drug traffickers often possess and store firearms in their residences, their vehicles, and in stash houses in order to protect themselves, their supplies of drugs, and/or drug proceeds;

c. narcotics traffickers must maintain, on hand, large amounts of U.S. Currency in order to maintain and finance their on-going narcotics business;

d. it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them including their residences and their vehicles;

e. it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, their vehicles, stash houses, and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

f. narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

g. even though these assets are in the names of others, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them;

h. it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics

proceeds, such as: currency, financial instruments, precious metals and gemstones, electronics, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses, vehicles or other locations which they maintain dominion and control over;

i. when drug traffickers amass significant proceeds from the sale of drugs, they often attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Traffickers often commingle narcotics proceeds with money generated by legitimate businesses;

j. traffickers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

k. traffickers take or cause to be taken photographs of themselves, their associates, and their property. That these traffickers usually maintain these photographs in their possession;

l. drug traffickers often use electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and or store information in furtherance of their drug trafficking activities;

m. drug traffickers often use cellular and/or portable telephones, smart phones, and other electronic equipment and data storage devices in furtherance of their criminal activities;

n. narcotics traffickers often utilize multiple vehicles in furtherance of their drug trafficking to include rental vehicles and vehicles registered in the names of third parties.

21. Based upon the information set forth above, and in light of my training and experience, I believe there is probable cause to believe the location to be searched contains evidence of drug trafficking by Valle, and others.

_____
Shane Larkin
Task Force Officer, FBI

Sworn to and subscribed before me on this 18th day of June, 2019.

_____
John H. Rich III
United States Magistrate Judge